Juyoun Han (seeking *pro hac vice*)
Eric Baum (seeking *pro hac vice*)
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
Tel: (212) 353-8700
Fax: (212) 353-1708
jhan@eandblaw.com
ebaum@eandblaw.com

John K. Buche (CA Bar No. 239477) (Local Counsel)
BUCHE & ASSOCIATES, P.C.
875 Prospect St., Suite 305
La Jolla, CA 92037
Tel: (858) 459-9111
Fax: (858) 430-2426
jbuche@buchelaw.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO DIVISION)

| | |
|---|---|
| The Estate of Carson Bride by and through his appointed administrator, Kristin Bride, and Tyler Clementi Foundation, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　*Plaintiff*,<br><br>　　v.<br><br>SNAP, INC., YOLO TECHNOLOGIES, INC., LIGHTSPACE, INC., DOES #1-10.<br><br>　　　　　　　　*Defendants*. | **Civil Action No.: 3:21-cv-3473**<br><br>**COMPLAINT**<br>**[CLASS ACTION]**<br><br>**DEMAND FOR JURY TRIAL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

PARTIES..............................................................................................................6

  The Plaintiffs...................................................................................................7

  The Defendants ..............................................................................................10

JURISDICTION AND VENUE .........................................................................12

FACTUAL ALLEGATIONS .............................................................................13

  Snapchat, LMK and YOLO apps ..................................................................13

  Inherently Dangerous, Defective Design of Anonymous Apps ....................14

  Cyberbullying and Teen Suicide....................................................................16

  Carson Bride's Death Caused by Cyberbullying ...........................................18

  Cyberbullying on YOLO Anonymous Messaging App..................................19

  YOLO's Misrepresentations...........................................................................22

  YOLO's Non-Response to Kristin Bride ........................................................27

  Cyberbullying on LMK Anonymous Messaging App ....................................30

  LMK's Misrepresentations.............................................................................31

  Cyberbullying on Snapchat and Misrepresentations regarding Snap Kits ....34

CLASS ACTION ALLEGATIONS ....................................................................39

FIRST CAUSE OF ACTION: Strict Liability....................................................44

SECOND CAUSE OF ACTION: Negligence.....................................................47

THIRD CAUSE OF ACTION: Fraudulent Misrepresentation ..........................49

FOURTH CAUSE OF ACTION: Negligent Misrepresentation .........................52

FIFTH CAUSE OF ACTION: Oregon UTPA (Or. Rev. Stat. §§ 646.605).......54

SIXTH CAUSE OF ACTION: New York General Business Law § 349 ...........57

SEVENTH CAUSE OF ACTION: New York General Business Law § 350..................62

EIGHTH CAUSE OF ACTION : California Business and Professional Code §§17200 & 17500.................................................................................................................63

NINTH CAUSE OF ACTION : Unjust Enrichment ..........................................64

TENTH CAUSE OF ACTION : Injunctive Relief..............................................65

PRAYER FOR RELIEF......................................................................................66

i

* * *

***Honoring Carson Bride, Tyler Clementi,***
***and for every teenager who will become upstanders.***

* * *

## INTRODUCTION

1.      This lawsuit is brought on behalf of Carson Bride, a 16-year-old teenager who took his own life after being a victim of cyberbullying on the following mobile phone applications ("apps"): "Snapchat" owned by Defendant Snap, Inc. ("Snap Inc."), "YOLO" owned by Defendant Yolo Technologies, Inc., and "LMK" owned by Defendant LightSpace, Inc. (collectively, "Defendants"), all of which are popular apps among teenagers.

2.      Carson asserts claims for strict liability, negligence, fraudulent misrepresentation, negligent misrepresentation, and violations of consumer protection laws on behalf of class members against the entities that developed and marketed Snapchat, YOLO, and LMK, for creating, maintaining, and distributing anonymous messaging apps to teens that are inherently dangerous and defective, and for falsely promising the enforcement of safeguards. Carson's mother, Kristin Bride, also bring claims of misrepresentation against Defendant YOLO.

3.      Tyler Clementi Foundation, a national advocacy organization whose mission is to combat bullying and cyberbullying, joins in this lawsuit.

4.      The claims in this action are not about third-party users' communications;

1

hence, this action does not focus on the users' communications themselves nor does it seek to punish the senders of the bullying and harassing messages.

5.      Rather, the claims here are about how the anonymous messaging apps designed and distributed products and services that are inherently dangerous, unsafe, useless. For decades, anonymous messaging apps been known to cause severe and fatal harm to teenagers, hence, the harms caused by Defendants' apps were foreseeable.

6.      The misrepresentation claims alleged focus on the concrete statements made by the apps about the <u>specific actions</u> they would take to safeguard young users from harm:

- YOLO stated that it would <u>reveal the identities</u> and <u>ban </u>users who engage in bullying and harassing behavior. YOLO stated that it has a zero-tolerance policy for bullying.

- LMK stated that it would <u>implement and enforce</u> zero-tolerance policies against bullying and harassing behavior, <u>monitor and report</u> any bullying and harassing behavior to law enforcement, and <u>prohibit </u>sexually explicit and inappropriate texts and photos.

- Snapchat stated that it would <u>remove</u> third party apps that allow bullying and harassing behavior on its platform.

7.      Despite the affirmative statements above, facts alleged here demonstrate that Defendants' apps are unable or unwilling to take action and carry out their promises to safeguard children.

2

8. Due to the Defendants' apps' defective design and their misrepresentations, millions of users are harmed daily, suffering permanent consequences.

9. Defendants knew, or should have known, that irreversible, deadly consequences will arise from the use of anonymous messaging apps used by teens.

10. In 2010, 17-year-old Alexis Pilkington from Long Island, New York was cyberbullied on *Formspring.me*, an anonymous question and answer site, and ended her own life.[1]

11. In 2011, 15-year-old Natasha MacBryde from Worcestershire, U.K., took her own life after receiving anonymous messages on *Formspring.me*. According to news reports, her family "believe[d] that the anonymous postings on the Formspring social networking website were a significant contributor" to her death.[2]

12. In 2011, 14-year-old Jamey Rodemeyer from Buffalo, New York took his life after receiving slurs on *Formspring.me* from anonymous senders.[3]

13. In 2012, 13-year-old Ciara Pugsley, from Leitrim, Ireland took her own life after being cyberbullied on an anonymous website, *ask.fm*.[4]

14. In 2015, 18-year-old Elizabeth Long created a *Change.org* petition signed by

---

[1] *Town angry over Net slurs at suicide victim*, NBC NEWS, March 26, 2010, at https://www.nbcnews.com/id/wbna36058532
[2] *Natasha MacBryde: Rail death teen threatened online*, BBC.COM, July 21, 2011, at https://www.bbc.com/news/uk-england-hereford-worcester-14239702
[3] *Jamey Rodemeyer Suicide: Police Consider Criminal Bullying Charges*, ABC NEWS, September 21, 2011, at https://abcnews.go.com/Health/jamey-rodemeyer-suicide-ny-police-open-criminal-investigation/story?id=14580832#.UXfKtrU3uSo
[4] *Third suicide in weeks linked to Cyberbullying*, IRISH EXAMINER, Oct. 29, 2012, at https://www.irishexaminer.com/news/arid-20212271.html

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

83,363 individuals to the creators of *Yik Yak*, an anonymous messaging app. Her message in the petition is loud and clear, and an excerpt is quoted here (emphasis added):

> *My name is Elizabeth. I'm 18 years old, and earlier this year I tried to commit suicide. While still recovering, I started seeing messages about me on Yik Yak, anonymously telling me that I should kill myself. And I am not the only one. . . it is time that we stand up and do something about it before a life is senselessly lost because of this app. Yik Yak allows users to post anonymous messages that are broadcast to other users close by. . . With the shield of anonymity, users have zero accountability for their posts, and can openly spread rumors, call classmates hurtful names, send threats, or even tell someone to kill themselves -- and all of these things are happening. The app claims that it is not meant to be used by people under 17, but there are no safeguards to prevent younger users from downloading the app . . . The app claims to not tolerate bullying or threats, but no action is being taken to remove threatening or harmful posts, or suspend users who write them . . . we want the app removed from the Apple App Store and Google Play immediately.[5]*

15.     Unfortunately, change did not happen in time, and later that year in 2015, Jacob Marberger, another teenager who was anonymously cyberbullied on the same app *Yik Yak*, ended his own life.[6]

16.     In 2018, a parent witnessed her 13-year-old daughter receive an anonymous message on the app *Sarahah* from a user who wrote: "I hope she kills herself." The parent started a *Change.org* petition that was signed by 466,714 supporters. *Sarahah* was removed from Apple and Google app stores after reported instances of severe cyberbullying became

---

[5] *Shut Down the app "Yik Yak"*, CHANGE.ORG, at https://www.change.org/p/tyler-droll-and-brooks-buffington-shut-down-the-app-yik-yak
[6] *Student's Suicide Prompts Investigation of College's Culture, Yik Yak*, NBC PHILADELPHIA.COM, Dec. 3, 2015, https://www.nbcphiladelphia.com/news/local/task-force-washington-college-jacob-marberger-bullying-social-media-yik-yak/157654/

4

known to the public.[7]

17.    According to a media interview by Tech Crunch, YOLO's founder Gregoire Henrion stated that the app focused on blocking 10% of offensive messaging. Henrion reportedly admitted that YOLO saw reviews about bullying from its users. Yet, in that report, Henrion brushed off the concern about bullying saying "it's nothing compared to any other anonymous app."[8]

18.    Carson's parents notified YOLO app and its founder Gregoire Henrion about Carson's death caused by cyberbullying and conveyed the urgency of revealing the identities of the users so that they can be prevented from harming other victims.  To date, no one has responded.

19.    Despite the widely reported danger of anonymous apps, opportunistic app developers like Defendants continued to reap profits using the same, defective, and inherently unsafe designs in apps that are marketed and used predominantly by teens.

20.    The dangerous design of YOLO and LMK, like all the other anonymous apps described above, provide the means, motive, and opportunity for cyberbullying.

21.    This lawsuit demands that Defendants be held accountable for the wrongful deaths, personal injuries, and other losses that Carson Bride and his family have suffered as a result of Defendants' defective and dangerously designed apps.

---

[7] *Ban apps like Sarahah where my daughter was told to "kill herself"*, CHANGE.ORG, https://www.change.org/p/app-store-google-play-ban-apps-like-sarahah-where-my-daughter-was-told-to-kill-herself?redirect=false
[8] Teen hit Yolo raises $8M to let you Snapchat anonymously, TECH CRUNCH, Feb. 28, 2020, https://techcrunch.com/2020/02/28/anonymous-snapchat-group-chat-yolo/

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

22. This putative class action further demands that Defendants be held accountable for designing defective and dangerous products and services, and for making false promises about the actions they would take to safeguard teens from cyberbullying. Such actions and misrepresentations violate consumer protection laws and other tort laws stated herein.

23. This putative class action additionally demands that YOLO and LMK be immediately discontinued and banned from the market until they can prove that effective safeguards are implemented and enforced. Additionally, for Snap Inc., this action demands that it immediately remove all third-party apps that fail to set up appropriate safeguards for young users from cyberbullying.

24. Defendants' owners, investors, and affiliates should be restrained from marketing, selling, operating, and otherwise replicating its services, specifically, anonymous messaging features, in the form of a different corporate entity and service.

## **PARTIES**

25. Plaintiffs, estate of Carson Bride through his appointed administrator Kristin Bride, Kristin Bride on behalf of herself, and Tyler Clementi Foundation (collectively, "Plaintiffs"), bring this action, on behalf of themselves and similarly-situated putative class members comprised of approximately 93 million U.S.-based users of "Snapchat" owned by Defendant Snap, Inc. ("Snap Inc."), approximately 10 million users of app "YOLO" owned by Defendant Yolo Technologies, Inc. ("YOLO"), and approximately 1 million

users of app "LMK" owned by Defendant LightSpace, Inc ("LMK") (collectively, Defendants).

***The Plaintiffs***

26.    At all relevant times, Plaintiff Carson Bride was a resident and a citizen of Oregon. Plaintiff Carson Bride on behalf of himself and all other similarly situated minor users of Defendants' apps that comprise the putative National class and Oregon sub-class, brings this class action against each and all of the Defendants.

27.    At all relevant times, Plaintiff Kristin Bride was a resident and a citizen of Oregon. Kristin Bride brings claims as the appointed administrator of Carson's estate and on behalf of herself.

28.    Plaintiff Tyler Clementi Foundation is a bona fide 501(c)(3) organization registered in New York[9] whose mission is to end online and offline bullying, harassment and humiliation. Plaintiff Tyler Clementi Foundation advocates for and educates parents and children who struggle with cyberbullying and safety issues. Plaintiff Tyler Clementi Foundation brings this class action against each and all of the Defendants on behalf of itself and the putative National class and New York sub-class.

29.    Tyler Clementi Foundation was founded in 2010 by the Clementi family in memory of Tyler Clementi, a beloved son and family member who took his own life after

---

[9] Tyler Clementi Foundation's temporary address during the time of the pandemic is at a P.O. Box in New Jersey, but its registration and work is centered in New York.

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

suffering from cyberbullying.

30.    Tyler Clementi Foundation works with individuals, minors, schools, educators, parents, companies, faith communities, universities and other individuals who themselves are or have been bullied as consumers of online platforms, or have children or students who are at risk of being bullied as consumers of online platforms.

31.     Tyler Clementi Foundation's Youth Ambassadors are members from high schools across the country who work to prevent bullying and cyberbullying within their schools and local communities. Youth Ambassadors serve for a one-year period. Upon information, several Youth Ambassadors have used, or are currently using, Defendants' apps: Snapchat, YOLO, and LMK.

32.    In addition to the Foundation's flagship bullying-prevention and education program #Day1, the Foundation runs other programs including the Upstander Pledge, Upstander Speaker Series, Tyler's Suite, and True Faith Doesn't Bully, a public education campaign that fights religious bullying.

33.    Tyler Clementi Foundation has engaged in extensive advocacy efforts propelling the introduction of bills in Congress that would prevent bullying and cyberbullying. Tyler Clementi Higher Education Anti-Harassment Act was introduced in Congress in 2011 and re-introduced in every congressional session, most recently in 2019. This bill would require colleges and universities receiving federal funding to prohibit harassment based on actual or perceived race, color, national origin, sex, disability, sexual

8

orientation, gender identity or religion.

34.    Tyler Clementi Foundation organizes research and education programs on cyberbullying harms and prevention, including but not limited to gathering and maintaining statistics on bullying, educating the public about online civility, creating campaigns and toolkits for online and offline bullying prevention (#Day1), and collaborating with Youth Ambassadors to create and connect with a community of Upstanders.

35.    Specifically, by researching and creating the 2020 Cyber Safety Guides and cyber safety campaigns such as "#Keepitcool," Tyler Clementi Foundation helps the public understand the importance of safety on social media and online platforms and de-escalating incivility that occur. According to the Foundation's research, "84 percent of Americans have experienced incivility first-hand and 69 percent believe that social media and the internet are to blame."[10]

36.    Tyler Clementi Foundation's cyberbullying prevention work includes conducting the Survey of New York City Teens developed in collaboration with AT&T's Corporate Social Responsibility initiative in 2016 and 2018.[11] That survey was comprised of 500 teens, 500 parents of teens, and 500 millennial parents of younger children in New York City. Most recently, Tyler Clementi Foundation has engaged in survey and data

---

[10] *Keep it Cool by Building Online Civility*, TYLER CLEMENTI FOUNDATION, July 18, 2017, at
https://tylerclementi.org/bullying-prevention-through-building-online-civility/
[11] *Tyler Clementi Foundation Emphasizes Early Bullying Prevention Efforts Following AT&T Survey on Cyberbullying, Online Behavior*, TYLER CLEMENTI FOUNDATION, Nov. 28, 2018, at https://tylerclementi.org/tyler-clementi-foundation-emphasizes-early-bullying-prevention-efforts-following-att-survey-on-cyberbullying-online-behavior/

collection efforts to investigate the impact of social media platforms and anonymity-based platforms on teenagers' mental health.

37.     In 2016, Tyler Clementi Foundation worked with teenagers in New York City in collaboration with AT&T and the All-American High School Film Festival to educate people about the effects of bullying and cyberbullying.

38.     Between 2015 and 2020, Tyler Clementi Foundation's founders and staff devoted time and resources to speak at more than 180 nationwide events, educating and advocating on behalf of minors and parents about combatting bullying and cyberbullying.

39.      As a result of Defendants' legal violations, Tyler Clementi Foundation has suffered injury in fact. Tyler Clementi Foundation has expended its resources to address the harms that arise from the use of Defendants' anonymous messaging apps.

40.     If Defendants were to cease their unlawful conduct alleged herein, Plaintiff Tyler Clementi Foundation would avoid diverting part of their organizational resources to educate the consumers and the public about the surreptitious harms arising from Defendants' apps, and the Foundation could redirect these resources to other projects in furtherance of its mission.

### ***The Defendants***

41.     Defendant Snap Inc. ("Snap Inc.") is a Delaware Corporation with its principal place of business in Santa Monica, California, doing business in California as Snapchat Inc. Each of the DOES 1-10 is the agent, servant, partner, joint-venturer, co-

10

venturer, "media partner," principal, director, officer, manager, employee, or shareholder of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its co-defendant(s) in said co-defendant(s) performance of the acts and omissions described below. Plaintiffs sue each of these Doe Defendants by these fictitious names because Plaintiffs do not know these Defendants' true names and capacities. Despite reasonable efforts, Plaintiffs have not been able to ascertain the identity of DOES 1-10.

42.     Defendant Yolo Technologies, Inc. (formerly Popshow, Inc.) is a Delaware corporation with its headquarters and principal place of business in Los Angeles, California. Yolo Technologies, Inc. is the developer of the app YOLO. Each of the DOES 1-10 is the agent, servant, partner, joint-venturer, co-venturer, "media partner," principal, director, officer, manager, employee, or shareholder of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its co-defendant(s) in said co-defendant(s) performance of the acts and omissions described below. Plaintiffs sue each of these Doe Defendants by these fictitious names because Plaintiffs do not know these Defendants' true names and capacities. Despite reasonable efforts, Plaintiffs have not been able to ascertain the identity of DOES 1-20.

43.     Upon information and belief, Defendant LightSpace, Inc., is a Cayman Island corporation with its principal place of business in Palo Alto, California. Each of the DOES

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

1-10 is the agent, servant, partner, joint-venturer, co-venturer, "media partner," principal, director, officer, manager, employee, or shareholder of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its co-defendant(s) in said co-defendant(s) performance of the acts and omissions described below. Plaintiffs sue each of these Doe Defendants by these fictitious names because Plaintiffs do not know these Defendants' true names and capacities. Despite reasonable efforts, Plaintiffs have not been able to ascertain the identity of DOES 1-20.

44.     Plaintiffs further allege that each and all of the Defendants are directly liable and/or vicariously, jointly and severally liable for the violations of state consumer protection laws and other tort law claims alleged herein.

45.     At all times relevant, Plaintiffs and/or those associated with Plaintiffs used the features of the Defendants' apps which includes the anonymous messaging features enabled through YOLO or LMK on Snapchat.

46.     Upon information and belief, Defendants' conduct directly affects millions of users to whom each Defendant owe a legal duty of care and to whom each Defendant is directly responsible for damages and the injuries caused.

## JURISDICTION AND VENUE

47.     This Court has diversity jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs,

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

exceeds $5,000,000 and is a class action in which some members of the class are citizens of states different from the states where Defendants are citizens.

48.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District as Defendants are: (a) authorized to conduct business in this District and has intentionally availed itself to the laws and markets within this District through the promotion, marketing, distribution and sale of its products in this District; (b) currently conducting substantial business in this District; and (c) are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### *Snapchat, LMK and YOLO apps*

49.    Snapchat is an American multimedia messaging app developed by Snap Inc. One of the principal features of Snapchat is that pictures and messages are typically only available for a short period of time. In October 2013, the app evolved from its original focus on person-to-person photo sharing to featuring users' "Stories," content that is available to a user's in-app friends for 24 hours.

50.    YOLO and LMK are apps on "Snap Kits" – third-party apps reviewed, vetted, and integrated for use on Snapchat so that users can access the third-party app's features on Snapchat's platform.

51.    Through Snap Kit, new apps like YOLO and LMK can instantly gain access to millions of Snapchat's teen users.

13

52.     YOLO and LMK are Snap Kit apps designed to allow Snapchat users to send messages anonymously. Predominantly used by teens, the apps allow teens to chat, exchange questions and answers, and send polling requests to one another on a completely anonymous basis – that is, the receiver of a message will not know the sender's account names, nicknames, online IDs, phone numbers, nor any other identifying information unless the sender "reveals" himself or herself by "swiping up" in the app.

### *Inherently Dangerous, Defective Design of Anonymous Apps*

53.     As stated in paragraphs 1 through 19 of this Complaint, the dangers associated with anonymous apps were widely reported throughout the news, media reports, petitions, and direct notifications by consumers which were directed at, or available to Defendants.

54.     When anonymity is involved, it reinforces depersonalization which leads to an increase in antinormative behavior and decrease in bystander intervention. A well-regarded study has found that "the perceived anonymity of the bystander [was] negatively related to their propensity to intervene."[12] Also, the perceived invisibility of the communicators can often lead to antinormative behavior" because the anonymity reinforces "depersonalization" (i.e., the inability to tell "who is who" online). According to the study, "depersonalization" happens in "online environments in which people are interacting with people they already know in a face-to-face context," as opposed to the

---

[12] N. Brody & A.L. Vangelisti, *Bystander Intervention in Cyberbullying*, COMMUNICATION MONOGRAPHS, 83:1, 94 (2016).

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

traditional sense of anonymity where people may be complete strangers to one another.[13]

55.    Well-cited studies reveal that "[a]nonymity has a more negative impact on the victim. Adolescents believed that the anonymous situation is more serious and has more of a negative impact on the victim."[14] The negative feelings that a victim feels is amplified when the bullying is anonymous, because the aggressor's intentions and perceptions are even more difficult to determine. Adolescents believe that anonymity allows individuals to behave in ways they might not otherwise (*e.g.*, engage in cyberbullying) since they can remain anonymous and have more power.[15]

56.    Leading experts who have spent years studying the causes and effects of bullying found that certain apps are a "one-stop shop for the bully" because everything they need is there: an audience, anonymity, an emphasis on appearances, and channels that range from public feeds to behind-the-back group chats.[16] All of these factors exist on the Defendants' apps.

57.    According to studies, significant challenges remain in the detection and mitigation of cyberbullying. While tech firms may incorporate human labor and/or machine-based methods to detect cyberbullying, human labor is costly and machine-based

---

[13] *Id.*(earlier version of the study available at https://www.natcom.org/sites/default/files/pages/NCA_Anti-Bullying_Resources_Brody.pdf, p. 20.)
[14] B. Mascotto, *Exploring the impact of anonymity on cyberbullying in adolescents: an integrative literature review*, University of Victoria (2015), available at https://dspace.library.uvic.ca/bitstream/handle/1828/5986/Mascotto_Brooke_MN_2015.pdf?sequence=1&isAllowed=y
[15] *Id.*
[16] Katy Steinmetz, *Inside Instagram's War on Bullying*, TIME, July 8, 2019, https://time.com/5619999/instagram-mosseri-bullying-artificial-intelligence/

15

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

detection are technologically infeasible to be effective. In particular, machine-based methods of sifting through contents are largely inaccurate due to the varied role and context of communication, ever-changing texts and visual lexicon of speech, the latency of the detection and mitigation after users' exposure to harm, and the challenge of scalability applied to a high volume of users.

58.     Particularly, anonymous apps pose unique challenges in detecting bullying and harassing behavior, because the anonymity renders the construction of the users' relationships nearly impossible.[17]

59.     According to reports, technology firms and social media firms are reluctant to hire staff to detect and take action to address bullying incidents due to the high cost of employing labor and resources.[18]

60.     While many apps put the burden on the users to block and report abusive behavior on mobile platforms, this does not safeguard vulnerable teens from harm because they have already been exposed to the harmful, hateful, and inappropriate messages. To prevent harm, the apps must enforce their own rule that deters abusive users by reporting to authorities and parents, revealing their identities and banning them from the apps.

***Cyberbullying and Teen Suicide***

61.     Experts have found that students who experienced bullying and/or

---

[17] Chelmis, C. & Zois, D., *Characterization, Detection, and Mitigation of Cyberbullying [Tutorial]*, ICWSM U. ALBANY (2018), available at http://www.cs.albany.edu/~cchelmis/icwsm2018tutorial/CyberbullyingTutorial_ICWSM2018.pdf
[18] *Why Content Moderation Costs Billions and is So Tricky for Facebook, Twitter, Youtube and other*, CNBC, Feb. 27, 2021, https://www.cnbc.com/2021/02/27/content-moderation-on-social-media.html

16

cyberbullying are nearly two times more likely to attempt suicide.[19] Victims of cyberbullying are at a greater risk than non-victims of both self-harm and suicidal behaviors.[20]

62.    According to the Pew Research Center, 59% of U.S. teenagers have been bullied or harassed online.[21] 80 percent of teenagers who responded to the survey believed that the platforms and messaging apps were not doing enough to prevent bullying and harassment online.   In this way, teenagers themselves believed that apps should be responsible for preventing bullying on online platforms.

63.    The mobile app companies are in the best position to prevent cyberbullying and enforce safeguards, because users interact within the apps' platforms instead of within classrooms where traditional bullying had occurred. According to reports, teen victims are less likely to report to parents and school officials about cyberbullying incidents because they worry that adults would then restrict their access to their mobile devices.[22] Teens also fear that they would get into trouble themselves if they had already been warned to stay off electronic devices or social media. Moreover, teens are concerned that if they report to

---

[19] Hinduja, Sameer & Patchin, *Bullying, Cyberbullying, and Suicide*. ARCHIVES OF SUICIDE RESEARCH : OFFICIAL JOURNAL OF THE INTERNATIONAL ACADEMY FOR SUICIDE RESEARCH (2010), available at
https://www.researchgate.net/publication/45289246_Bullying_Cyberbullying_and_Suicide.
[20] John A, Glendenning AC, Marchant A, Montgomery P, Stewart A, Wood S, Lloyd K, Hawton K, *Self-Harm, Suicidal Behaviours, and Cyberbullying in Children and Young People: Systematic Review*, J MED INTERNET RES (2018);20(4):e129 doi: 10.2196/jmir.9044
[21] *A Majority of Teens have Experienced Some Form of Cyberbullying*, PEW RESEARCH CENTER (Sept. 27, 2018),
https://www.pewresearch.org/internet/2018/09/27/a-majority-of-teens-have-experienced-some-form-of-cyberbullying/
[22] *Why Victims of Bullying Often Suffer in Silence* (Feb. 27, 2021), VERYWELL FAMILY,
https://www.verywellfamily.com/reasons-why-victims-of-bullying-do-not-tell-460784

17

adults, the bullying will exacerbate or that their aggressors would retaliate.[23]

64.   During the COVID-19 pandemic, as of June 2020, 62 percent of parents of U.S. teens aged 14-17 years stated their children were spending more than 4 hours per day on electronic devices, nearly a two-fold increase compared to the pre-pandemic times when only 32 percent of parents of U.S. teens aged 14-17 years were spending more than 4 hours per day on electronic devices.[24] Upon information and belief, Defendants' apps thrived and profited throughout the pandemic given the surge of users' time spent on their apps.

### Carson Bride's Death Caused by Cyberbullying

65.   According to his family and friends, Carson Bride was a teenager who had "an infectious smile that would brighten everyone's day." When he passed away from suicide on June 23, 2020, he was 16 years old and had just completed his sophomore year in high school. He was a caring and compassionate teenager who taught ski classes to children during winters.

66.   Carson took his own life by hanging himself at his home on the morning of June 23, 2020.

67.   On or about July 4, 2020, it was revealed that Carson had been bullied on Defendants' apps Snapchat, YOLO and LMK prior to his suicide.

68.   After Carson ended his life, two psychologists who provided care to Carson

---

[23] *Id.*

[24] *Internet Demographics and Use*, STATISTA, https://www.statista.com/statistics/1189204/us-teens-children-screen-time-daily-coronavirus-before-during/

and his family opined that Carson's suicide was triggered by cyberbullying.

69.    Carson's parents did not consent nor were present when their son Carson downloaded the Defendants' apps and presumably agreed to their Terms of Use.

70.    The Defendants purport to enter in to their Terms of Service with minors who lack the capacity to enter in to contracts in the first place.

71.    Carson's mother, Kristin Bride, on behalf of her deceased son Carson Bride, hereby disaffirms the Terms of Use, Terms of Service, Privacy Policy, and/or EULA agreements between her son and each all of Defendants as it relates to their apps.

### *Cyberbullying on YOLO Anonymous Messaging App*

72.    Released in May 2019, YOLO (which stands for the phrase "You Only Live Once") is an anonymous question-and-answer app.

73.    YOLO launched on Snap Kit which enables the app to be integrated and used on Snapchat. YOLO users can create a content Q&A post. Incoming questions would appear in the YOLO app, but users must go back to Snapchat to answer them.

74.    Upon information and belief, from January 23, 2020 to June 22, 2020, Carson received 105 messages via YOLO. He received 35 anonymous messages between January 23, 2020 and January 29, 2020. Carson received 13 anonymous messages from May 25, 2020 to May 31, 2020. The anonymous messages Carson received surged from June 7, 2020 to June 22, 2020, just prior to his death, during which time Carson received 57

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

messages from anonymous users on YOLO.

75.   Upon information and belief, of the 105 anonymous messages Carson received via YOLO, 62 messages included content that was meant to humiliate him, often involving sexually explicit and disturbing content.

76.   On May 31, 2020, messages sent to Carson included threats:

- "Remember when someone threatened to push u [Carson] into the Grand Canyon, that shit was so funny"

- "I'm gonna push u [Carson] into the Grand Canyon."

77.   Later, on June 7, 2020, Carson received the following messages after an incident where he had fainted during his biology class: "When u passed out in Biology I put my balls in ur mouth" and "When you passed out I ate your ass."

78.   Upon information and belief, 27 out of 105 YOLO messages involved catfishing, a deceptive activity where a person creates a fake identity on a social platform, usually targeting a specific victim for abuse. These messages are also sexually explicit in nature, including "are you a virgin"; "I WANT YOUR WEINER NOWWWW"; and "Sometimes I print ur face out and throw darts at it…but others I just want ur tender love in the night."

79.   Upon information and belief, on June 7, 2020, after receiving numerous abusive, harassing, and upsetting messages on YOLO, Carson searched YOLO's website and other websites searching for "YOLO reveal," "YOLO username reveal hacks," and

20

other keyword searches in an effort to find out who was sending abusive messages to him.

80.     Upon information and belief, Carson relied on YOLO's misrepresentation that YOLO would reveal the identities of the aggressors.

81.     In responding to numerous abusive messages, Carson asked the anonymous users sending him abusive messages to voluntarily "S/U" (Swipe Up) to reveal their identities. None of the users chose to reveal themselves.

82.     On or about June 13, 2020, 10 days before his death, Carson asked a friend via text message about the identities of the anonymous senders: "Do you know who is sending me all these sus(picious) YOLOs. Whenever I do one I only get people either trying to catfish me or bait me into saying dumb (things) or whatever . . . I guess I understand like a bit of sus(picious) shit every once in a while but it [is] my entire inbox of YOLO's."

83.     On June 21 and 22, 2020, Carson posted his final Snapchat story about starting a summer job at Papa Murphy's pizza restaurant: "Pull up to Papa Murphy's at 3-5 on Wednesday [i]f you wanna see me working"; "Come to Papa Murphy's and order Pizza."

84.     On June 21 and 22, 2020, Carson received anonymous responses to his Snapchat story via YOLO: "why do you make my peepee so hard"; "How big is your penis"; "How big are your balls."

85.     Upon information and belief, on June 23, 2020, the morning of Carson's death, the last web history found from his phone shows that Carson was again searching

21

"Reveal YOLO Username Online" which reflects his final painstaking attempt to find out who was sending abusive YOLO messages to him.

86.     YOLO developed, designed, and distributed the anonymous messaging feature to minor users, despite the known dangers and the foreseeability of injury and wrongful deaths caused by its services. In this way, YOLO failed to exercise the duty of care owed to Carson and other users.

### *YOLO's Misrepresentations*

87.     On the Google Play store, YOLO is accompanied by a "Teen" content rating, intentionally focusing its marketing and solicitation toward teenagers.[25] According to Google Play Help, the content ratings in the app store "are the responsibility of the app developers." Users are not required to input their date of birth or age verification process when they sign up for YOLO.



---

[25] Google Play Help, *Apps & Games Content Ratings on Google Play*:
https://support.google.com/googleplay/answer/6209544?p=appgame_ratings&visit_id=637560335067969325-3904586056&rd=1

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

88.     When a user first opens YOLO after downloading it from the Apple or Google app store, a pop-up notice fills the screen: "By using YOLO you agree the terms of service (EULA) and privacy policy. YOLO has no tolerance for objectionable content or abusive users. You'll be banned for any inappropriate behavior."



89.     On the first screen of the user's interface with the app, YOLO states, "No bullying. If you send harassing messages to our users, your identity will be revealed."



*Bride et al. v. Snap Inc. et al.* – COMPLAINT

90.    The YOLO App Store page also states: "Be kind, respectful, show compassion with other users, otherwise you will be banned."



91.    In the most visible places, YOLO falsely represented it would take concrete actions to enforce safeguards: that the abusive users' accounts will be banned and their identities will be revealed.

92.    However, abusive users remain anonymous and active on the YOLO platform even after victims have repeatedly reported inappropriate content or harassment and asked for their identities to be revealed.

93.    According to Apple Store's user reviews, YOLO routinely ignores requests by consumers to ban or reveal the identity of users engaging in harassing or bullying

24

behavior, even when users have reported death threats and suicidal thoughts:

- ******, 09/13/2020: "This app does not prevent bullying. It says above every YOLO question that any user will get banned from the app if they say anything considered as bullying. Well, I am very disappointed because I have seen more than enough users' telling children to "kill themselves." I personally know one child that had these messages coming in repeatedly for months, and is still getting them to this day. The child had even had many suicidal thoughts and actions."

- *****, 05/16/2019: "I've gotten disgusting messages that I've reported and waited to see whose name it would be so I know on my Snapchat who to delete but how would I know if they don't reveal the names instantly. When I reported this issue I pressed the report button and the conversation deleted but no name shows up so I still believe that whoever is on my Snapchat is still on my friends list . . ."

- ******dove, 3/25/2020: "it says that only positive messages are allowed and that if you bully or harass someone you will be banned from yolo. But I have gotten messages where I have been bullied and that person was not banned. . ."

- ******, 11/18/2019: "My daughter has been getting bullied on this app and we report/block, and this bully keeps on going and it's about suicide! . . . If someone truly reports someone this nasty on the app, it should be dealt with instantly!!"

- Briggs ****, 02/17/2020: "At a time when suicide is the number 1 killer of teens in America, we definitely don't need apps like this where bullied haters can hide behind a screen . . ."

- Ieila****: 01/14/2021: "Honestly, the hate and death threats . . . on this app should be immediately taken care or when we report something someone has anonymously said."

- Uhohsp***: 08/10/2020: "In a few group chats people have been using the ghost messages to cyberbully people by calling them fat, ugly, gross and such and sometimes even to kill themselves. . . I think it would be practical that if someone sends an outrageous message like that, getting

25

flags would result in a ban? . . . these messages hurt. I am a pre-teen and I know kids my age are going to take these comments personally. I just want everyone to stay safe."

94.     According to one review, YOLO's failure to unmask and ban abusive users from the platform encourages bullying behavior:

- Nicole *******, 09/29/2019: "it's teaching our youth that it's okay to hide behind a screen and bully. So if someone want to say something nice, they should say it to them directly, not through an anon[ymous] messaging app where people are constantly getting hurt and bullied . . ."

95.     If YOLO had followed its own stated policy and revealed the identities or banned abusive users, more users would be deterred from engaging in harassing or bullying because they would know they would be held accountable for their actions.

96.     YOLO's anonymous app hinders parents, guardians, and educators from taking action because they do not know who the sender of the message might be.

97.     YOLO's own privacy policy states that it collects personally identifiable information to "protect and enforce our rights and the rights of other Users against unlawful activity, including identify theft and fraud, and other violations of our Terms of Use." The Terms of use reiterates its zero-tolerance policy toward bullying and harassment.

98.     Despite its representations to consumers, YOLO is unable and/or unwilling to detect content that constitutes bullying, harassing, and inappropriate comments. YOLO is also unable and/or unwilling to ban abusive users which contradicts their own stated policies and guidelines.

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

99.    Upon information and belief, Carson relied on the misrepresentations of YOLO that it would ban and reveal identities of users engaging in bullying and harassing behavior. Many users like Carson relied on these representations. According to the customer reviews (paras. 93-94), many users made reports to YOLO to unmask identities or block abusive users but received no resolution nor any response.

100.    Contrary to the representation that YOLO would <u>ban</u> and <u>reveal</u> users who are engaging in bullying and harassment, YOLO failed to identify, detect, prevent, protect, or otherwise take any action to prevent the harm that Carson suffered using the YOLO app. YOLO's misrepresentations were material and resulted in the injury suffered by Carson and other consumers.

101.    Carson's estate is therefore entitled to compensatory and punitive damages for intentionally causing physical and emotional pain and distress suffered by Carson Bride in the months leading to his death, and the pecuniary loss and loss of society, companionship, services and expenses incurred, in the amount that the jury may determine fair and reasonable.

### ***YOLO's Non-Response to Kristin Bride***

102.    On or around July 6, 2020, two weeks after Carson's death, his parents Kristin and Tom Bride contacted YOLO's app developers. Using the Contact Us form on YOLO's Customer Support page, Kristin and Tom wrote about the cyberbullying that occurred on YOLO and their son's resulting death.

27

103.   In the message to YOLO, Kristin and Tom Bride conveyed the urgency about this topic, expressing that YOLO must reveal the abusive users' identities to protect other children from the same harm that happened to her son.

104.   To date, YOLO has not responded.

105.   On September 26, 2020, approximately three months after Carson's death, Carson's parents again sent an email entitled "Our Son's Suicide – Request for Help" to the law enforcement email address (lawenforcement@onyolo.com) provided by YOLO for reporting emergencies. Carson's parents expected that sending an email to the "law enforcement" address might prompt a timely response.

106.   In the email, Carson's parents included details about the abusive messages that anonymous YOLO users had sent to Carson prior to his death. In addition, Carson's parents wrote:

> "Clearly, no one was policing YOLO when my son received hundreds of abusive messages during the first 3 weeks of June. These offenders may very well be continuing their bullying practices, especially now that they know the power of their words. For this reason, we are requesting the contacts of every SnapChat/YOLO anonymous user who sent a message to my son's SnapChat account [] during the month of June 2020 . . . If you create an app which provides a platform for the anonymous bullying of vulnerable teens, the very least you can do is take accountability and assist the parents of your app's victims so that more YOLO deaths do not occur."

107.   The email sent to the email address "lawenforcement@onyolo.com" immediately bounced back displaying the following error message: "The following recipient(s) cannot be reached" due to "invalid address."

28

108.   YOLO again misrepresented and/or implied that it would provide users a way to contact them to report any issues that relate to law enforcement, when in fact, YOLO did not even maintain such an email account.

109.   Kristin simultaneously sent the same message to YOLO's Customer Support, which was returned with an automated response, stating "We're currently checking your message and will respond as soon as we can."

110.   To date, no one from YOLO's Support Team has responded.

111.   On December 16, 2020, Kristin once again tried to reach YOLO's team through the help of Josh Golin, Executive Director of the organization *Campaign for a Commercial-Free Childhood*, who directly contacted Gregoire Henrion (Co-founder and CEO of YOLO) through LinkedIn, a social media site for professional networks, demanding that YOLO provide a response to Kristin and Tom Bride.

112.   To date, no one from YOLO has responded.

113.   On December 30, 2020, Kristin again contacted YOLO's team through YOLO's "Contact Us" form and email (lawenforcement@onyolo.com).

114.   To date, no one from YOLO has responded.

115.   Contrary to its representations in its Terms of Use and other policies, YOLO failed to protect, communicate, and respond to reports from its teen users and their parents.

116.   Reasonably relying on the misrepresentations of YOLO with respect to its protection of users, Kristin Bride used YOLO's service and suffered injury in fact.

117.   Kristin is therefore entitled to compensatory damages for physical and emotional pain and distress in the amount that the jury may determine fair and reasonable.

118.   Kristin is also entitled to injunctive relief and punitive damages for the gross, continued, and callous misrepresentations and non-response of Defendant YOLO even after being notified of Carson's death multiple times.

### *Cyberbullying on LMK Anonymous Messaging App*

119.   LMK is an anonymous Question and Answer and polling app that integrates with Snapchat through Snap Kit. LMK users can create and customize stickers and backgrounds while sharing polls with their friends on Snapchat. Other users vote anonymously and the user who posted the poll can share results on Snapchat.

120.   From January 23, 2020 to June 22, 2020, Carson received numerous messages on LMK.

121.   On June 21 to 22, 2020, Carson received the following messages on LMK: "Ayo where is the horse cock bb"; "Yes daddy harder daddy"; "hi babygirl do you wanna have a threesome sometime?"; "My WiFi sucks so I just flick the bean to ur Bitmoji"; "Do them every week pls daddy I got a hard on for your reply's just let my gf watch u and flick her bean."

122.    On June 21, 2020, Carson stated in a private message to his friend on LMK: "for some reason whenever I do one of these [posts]" people send messages containing sexually explicit and harassing comments such as "beanflickers."

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

1   123.   LMK maintained, developed, and distributed anonymous features which are

2   dangerous, despite the foreseeability of injury and wrongful death caused by its services to

3

4   teen users. LMK failed to take action to <u>enforce</u> its purported zero-tolerance policies

5   against bullying and harassing behavior, failed to <u>monitor and report</u> bullying and harassing

6

7   behavior to law enforcement, and failed to <u>prohibit</u> sexually explicit and inappropriate texts

8   and photos sent to young users as they promised in their stated policies and guidance. In

9   this way, they have failed to exercise the duty of care owed to its users including Carson.

10

11   ***LMK's Misrepresentations***

12   124.   On Google Play Store, LMK is accompanied by a "Teen" content rating sign,

13   indicating that the app is marketed toward teenage users. According to Google Play,

14

15   content ratings are the responsibility of app developers.[26]

16

17

18   

19

20

21

22

23   125.   According to the LMK's Guidelines, LMK does "not tolerate any sexually

24   explicit content. This includes content in the form of text, photo, and video." LMK

25

26

27   ---
[26] Google Play Help, *Apps & Games Content Ratings on Google Play*,
28   https://support.google.com/googleplay/answer/6209544?p=appgame_ratings&visit_id=637560335067969325-
3904586056&rd=1

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

represented that it "does not tolerate ANY objectionable content or abusive users."[27]

126.   LMK's Terms of Use states that it will not tolerate any user who is "mean, is bullying someone or is intended to harass, scare or upset anyone." It expressly represents: "LMK does not tolerate ANY objectionable content or abusive users. Any objectionable content posted on LMK will be reviewed by our Content Safety team." "Reports of stalking, threats, bullying, or intimidation, are taken very seriously and may be reported to law enforcement."

127.   According to LMK's Privacy Policy, LMK collects information about "how [users] communicate with other users on LMK, such as their names, the time and date of your communications, the number of messages [users] exchange with your friends, which friends [users] exchange messages with the most, and [the user's] interactions with messages (such as when [users] open a message or capture a screenshot)."[28]

128.   LMK represented that it would "go to great lengths to protect our community from 'inappropriate users' by implementing various technology and moderation practices including: Artificial intelligence technology to identify potentially inappropriate content within text . . . human moderation to assess whether content or user violates our Community Guidelines."[29]

129.   According to the above representations -- that LMK collects a wide variety of

[27] Guidelines, LMK, at https://www.lmk.chat/guidelines
[28] Privacy Policy, LMK, https://www.lmk.chat/privacy
[29] *What is LMK doing to ensure safety within the app?,* LMK Support Center, https://lmk.zendesk.com/hc/en-us/articles/360047469394-What-is-LMK-doing-to-ensure-safety-within-the-app-

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

private data of minor users and uses artificial intelligence technology and human labor to discern whether contents are harmful -- LMK would have known that teen users, including Carson, were receiving sexually explicit contents, bullying, and harassing messages.

130.   Despite its knowledge of bullying, LMK did not _report_ the incident to the police, did not _enforce_ its "no tolerance" policy, and did not _prohibit_ sexually explicit content.

131.   LMK represents that it is collecting a wide variety of information about the users that would reveal their age and contents exchanged, including: "names of other users, time and date of communications, number of messages you exchange with your friends . . . content information, usage information, location information, and phonebooks."

132.   Despite its representations to consumers, LMK is unable and/or unwilling to detect behavior that constitute bullying, harassing, and inappropriate comments by users per its own policies and guidelines.

133.   Upon information and belief, Carson relied on the misrepresentations of LMK, that it would prohibit sexual content (text, photo, and video) and report threats, bullying or intimidation. These misrepresentations were material and resulted in the injury suffered by Carson and other consumers.

134.   Carson's estate is therefore entitled to compensatory and punitive damages for intentionally causing physical and emotional pain and distress suffered by Carson Bride in the months leading to his death, and the pecuniary loss and loss of society,

33

companionship, services and expenses incurred, in the amount that the jury may determine fair and reasonable.

135.   Putative class members would use LMK's services in the future which entitles them to injunctive relief. Putative class members are also entitled to compensatory damages, restitution, and punitive damages in the amount that the jury may determine fair and reasonable.

### *Cyberbullying on Snapchat and Misrepresentations regarding Snap Kits*

136.   Snapchat is a software service by Snap Inc. that provides a mobile app allowing consumers to send and receive photo and video messages. Snapchat markets itself as a messaging app in which contents are posted for a short time before they disappear from users' view.

137.   Market and consumer data company Statista found that, as of June 2020, 66.5% of Snapchat users in the United States were between 12 and 17 years of age, making it the No. 1 app used among teenagers.[30]  Since the spring of 2016, Snapchat consistently ranks as the most popular social network for teenagers in the United States.  Yet, 31% of young people experienced cyberbullying on Snapchat.[31]

138.   The age rating for Snapchat is 13, but there is no age verification procedure

---

[30] *Most popular social networks of teenagers in the United States from fall 2012 to fall 2020*, Statista,
https://www.statista.com/statistics/250172/social-network-usage-of-us-teens-and-young-adults/
[31] *Id.*

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

in the sign-up process.

139.   Snap Kit is Snap Inc.'s platform which allows third-party apps to use Snapchat features. Snap Kit grants third-party apps access to Snapchat's Application Programming Interface (API). Third-party apps on Snap Kit can allow users to user their Snapchat credentials to log-in.

140.   Snap Inc. benefits from Snap Kit by bringing new users to Snapchat via third-party apps while reengaging existing users by offering a variety of third-party, add-on services. Third-party app developers benefit through Snap Kit by generating referral traffic by tapping into Snapchat's more than 280 million teen users world-wide.[32]

141.   Since on or around May 2019, both LMK and YOLO were approved by Snap Inc. to be used on Snapchat through Snap Kit. Both apps are also advertised for "teens" and provide a platform for anonymous chat, polling, and Q&A.

142.   Upon information and belief, YOLO and LMK's users are predominantly teens.

143.   Developers of third-party apps seeking access to Snap Kit must pass a human review and approval process, and Snap Inc. reviews the functionality of the other apps to ensure they satisfy Snap Inc.'s standards. Snap Inc.'s approval process is meant to retain control over the third-party app's operations. Snap Inc.'s trust, safety and customer

---

[32] Josh Constine, *Snapchat launches privacy-safe Snap Kit, the un-Facebook Platform*, TechCrunch, June 14, 2018, at https://techcrunch.com/2018/06/14/snapchat-snap-kit/

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

operations teams review the third-party apps before they approve them for Snap Kit access. Snap Inc. represented that, if Snap Inc.'s review teams have any concerns about a third-party app's "security or intentions," the third-party app is denied access to Snap Kit.[33]

144. According to Snap Kit App Review Guidelines, third-party apps that "[e]ncourag[e] or promot[e] violence, harassment, bullying, hate speech, threats, and/or self-harm" are considered "unacceptable." Unacceptable features or content include "inadequate safeguards in place to prevent this type of behavior."[34]

145. Per the Snap Kit App Review Guidelines, to access Snap Kit, all third-party apps "containing user generated content must have the ability to report inappropriate content and have a contact method made available to users. The developer team should be able to swiftly and effectively handle any concerns raised about the safety of users."[35]

146. Snap Inc. states that if a third-party app violates the Review Guidelines or contains unacceptable features or content, Snap Inc. will remove the third-party app. One example of unacceptable features include: "Encouraging or promoting violence, harassment, bullying, hate speech, threats, and/or self-harm. This also includes inadequate safeguards in place to prevent this type of behavior."[36]

147. According to Snap Kit's Review Guidelines, where an app contains potential

---

[33] Lauren Goode, Snap Will Let Other Apps Use Its Features, But Not Your Data, WIRED, June 14, 2018, https://www.wired.com/story/snap-kit/
[34] Snap Kit App Review Guidelines, https://kit.snapchat.com/docs/review-guidelines
[35] Id.
[36] Id.

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

trust and safety issues, including "user-generated content, anonymous postings . . . or an audience that includes minors" the app would be subject to longer and on-going review processes.

148.   Snap Inc. states that it would take negative user feedback in to account in reviewing third-party apps.[37]

149.   Additionally, Snap Kit's Review Guidelines state, "[a]ll apps must conform with local laws and regulations in the jurisdiction where they are available."[38] Almost all states and territories in the U.S. has Anti-Bullying laws that prohibit bullying and require reporting incidents, prevention methods, and safeguards.[39]

150.   Upon information and belief, none of the promises and policies stated by Stan Inc. above are enforced.

151.   Both LMK and YOLO were subject to Snap Kit's Review Guidelines and periodic review processes. But despite LMK and YOLO's defectively designed anonymous messaging features that were known to promote cyberbullying and harassment among users, Snap Inc. did not remove them from Snap Kit.

152.   Snap Inc. knew about the dangers of anonymous apps that promote cyberbullying, because similar problems had surfaced when Snap Inc. had previously

---

[37] *Id.*
[38] *Id.*
[39] *Key Components in State Anti-Bullying Laws, Policies, and Regulations*, STOPBULLYING.GOV, https://www.stopbullying.gov/resources/laws/key-components

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

allowed the anonymous app *Sarahah* to be used in connection with Snapchat's platform.[40] *Sarahah* app was eventually banned from Apple and Android app stores for "making bullying easy."[41]

153.   Snap Inc. represented that third-party apps on Snap Kit are periodically re-reviewed for compliance.[42] Through numerous reports, customer complaints and negative feedback – which Snap Inc. purports to take into account in their review -- Snap Inc. would have known that the anonymous messaging apps YOLO and LMK are causing fatal harm and that those apps had failed to enforce safeguards. Yet, contrary to the representations in its Review Guidelines, Snap Inc. has not removed YOLO and LMK from its platform.

154.   Despite numerous reports of harassment, bullying, and harm suffered by teenagers arising from anonymous features embedded in YOLO and LMK, Snap Inc. reviewed, vetted, and approved YOLO and LMK to be on Snap Kit, exposing millions of teen users on Snapchat to these apps. Snap Inc. continues to provide YOLO and LMK access to its platform, users, and suite of services.

155.   Despite its representations to consumers, Snap Inc. maintained, developed, and distributed anonymous features together with YOLO and LMK to Snapchat's teen users, despite knowledge of their dangerous and defective design.   The injuries and

---

[40] *How to Link your Sarahah Account To Your Snapchat – Here's How,* BUSTLE, Aug. 10, 2017, https://www.bustle.com/p/how-to-link-your-sarahah-snapchat-so-your-friends-can-send-you-messages-75838
[41] *Sarahah: Popular Anonymous Messaging App Blamed for Making Abuse Easy is Kicked Off iphone and Android,* INDEPENDENT, Feb. 26, 2018, https://www.independent.co.uk/life-style/gadgets-and-tech/news/sarahah-banned-iphone-android-download-app-store-down-not-working-anonymous-curious-cat-a8228941.html
[42] Snap Kit App Review Guidelines, https://kit.snapchat.com/docs/review-guidelines

---

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

wrongful deaths caused by anonymous apps to teen users were foreseeable, but Snap Inc. failed to maintain safeguards to protect users from harm. In this way, they have failed to exercise the duty of care owed to Snapchat users including Carson Bride.

156.   Upon information and belief, Carson relied on the misrepresentations of Snap Inc. that it reviewed, vetted, and approved third-party apps like YOLO and LMK, and that it would remove third-party apps from Snap Kit if they fail to comply with Snap's Review Guidelines. These misrepresentations were material and resulted in the injury suffered by Carson and other consumers.

157.   Carson's estate is therefore entitled to compensatory and punitive damages for intentionally causing physical and emotional pain and distress suffered by Carson Bride in the months leading to his death, and the pecuniary loss and loss of society, companionship, services and expenses incurred, in the amount that the jury may determine fair and reasonable.

158.   Putative class members would use Snapchat's services in the future which entitles them to injunctive relief. Putative class members are also entitled to compensatory damages, restitution, and punitive damages, in the amount that the jury may determine fair and reasonable.

## CLASS ACTION ALLEGATIONS

159.   Plaintiffs bring this class action on behalf of themselves and Class Members pursuant to Rule 23 of the Federal Rules of Civil Procedure.

39

160.   Plaintiffs Carson Bride and Tyler Clementi Foundation seek to represent a national "Snapchat Class" defined as follows: All United States residents between the ages of 13 and 17, who are or were registered users of Snapchat between May 10, 2018 and the date of judgment in this action, excluding Defendant, Defendant's officers, directors, and employees, Defendant's subsidiaries, the Judge to which this case is assigned and the immediate family of the Judge to which this case is assigned.

161.   Plaintiffs Carson Bride and Tyler Clementi Foundation seek to represent a national "YOLO Class" defined as follows: All United States residents between the ages of 13 and 17, who are or were registered users of YOLO between May 1, 2019 and the date of judgment in this action, excluding Defendant, Defendant's officers, directors, and employees, Defendant's subsidiaries, the Judge to which this case is assigned and the immediate family of the Judge to which this case is assigned.

162.   Plaintiffs Carson Bride and Tyler Clementi Foundation seek to represent a national "LMK Class" defined as follows: All United States residents between the ages of 13 and 17, who are or were registered users of LMK between May 1, 2019 and the date of judgment, excluding Defendant, Defendant's officers, directors, and employees, Defendant's subsidiaries, the Judge to which this case is assigned and the immediate family of the Judge to which this case is assigned.

163.   Plaintiffs reserve the right to re-define any of the Class definitions prior to class certification or thereafter, including after having the opportunity to conduct

40

discovery.

164.   Plaintiffs are members of the putative class that they seek to represent.

165.   The definition of the putative class is narrowly tailored to include only persons who can be identified through Defendants' database of registered users for the discrete period of time from when the Defendants' apps launched through the date of judgment in this action, or from the appropriate statutory limitations period through the date of judgment in this action.

## ***F.R.C.P. 23(a)***

166.   The proposed class is so numerous that the individual joinder of all its members, in this or any action, is impracticable. The exact number or identification of the members of the putative class is presently unknown to Plaintiffs, but it is believed to comprise millions of United States residents throughout the nation, thereby making joinder impractical.

167.   Common questions of fact and law exist as to all Class Members. These include, but are not limited to, the following:

(a) Whether the defective design of the anonymous messaging function was dangerous such that the solicitation, maintenance and distribution of the apps' services constitute unfair and deceptive business practices;

(b) Whether the representations made by each of the Defendants' apps were materially misleading to consumers;

41

(c) Whether Defendants failed to carry out what they explicitly represented through their app store descriptions, terms of use, and privacy policy;

(d) Whether Defendants' conduct resulted in harm to consumers; and

(c) Whether Plaintiffs and the Class members are entitled to an injunction, damages, restitution, equitable relief and other relief deemed appropriate and the amount and nature of such relief.

168. Plaintiffs' claims are typical of the claims of the putative class members. Plaintiffs and all putative Class members were subject to the above misrepresentations made by Defendants and all have claims based on the same legal theories against the Defendants.

169. The factual bases of Defendants' misconduct are common to the putative Class members and represent a common scheme and pattern of practice surrounding the defectively designed products and services, and misrepresentations about their services and guidelines, and enforcement, resulting in injury to all putative class members alike. Plaintiffs are asserting the same rights, making the same claims, and seeking similar relief for themselves and all other putative class members.

170. Plaintiffs are adequate representatives of the proposed class because they are putative class members and do not have interests that conflict with those of the other putative class members they seek to represent.

171. Plaintiffs are represented by experienced and able counsel, who have litigated

42

lawsuits of this complexity, and Plaintiffs' Counsel intends to prosecute this action vigorously for the benefit of the proposed class. Plaintiffs and their Counsel will fairly and adequately protect the interests of the class members.

### *Plaintiffs' Class Seeks Certification under F.R.C.P. 23(b)(3)*

172.   The central questions of whether Defendants' apps were dangerous and defectively designed, and whether Defendants' made misrepresentations about their safeguards and enforcement predominate over all other questions, both legal and factual, in this litigation.

173.   A class action is the superior method available for the efficient adjudication of this litigation because: (a) The prosecution of separate actions by individual members of the Class would create a foreseeable risk of inconsistent or varying adjudications which would establish incompatible results and standards for Defendant; (b) Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their own separate interests; (c) Class action treatment avoids the waste and duplication inherent in potentially thousands of individual actions, and conserves the resources of the courts; and (d) the claims of the individual class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for the members of the Class to individually seek redress for Defendant's

wrongful conduct. Even if the members of the Class could afford individual litigation, the court system could not. Moreover, this action is manageable as a class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### ***Plaintiffs' Class Seeks Certification under F.R.C.P. 23(b)(2)***

174.   A class action for injunctive and equitable relief pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure is also appropriate. Defendant acted or refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole. Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs, on behalf of the Class, seeks damages and injunctive relief described herein. Moreover, Defendant's systemic policy and practices make declaratory relief with respect to the Class as a whole appropriate.

### FIRST CAUSE OF ACTION: STRICT LIABILITY
(Plaintiff Estate of Carson Bride Individually and on Behalf of a National Class Against All Defendants)

175.   At all times relevant to this action, Defendants directed its business activities, solicited the use of, and provided service to residents in Oregon, and conducted regular, sustained, and isolated business activity in the state of Oregon.

176.   Plaintiff Carson Bride brings this claim individually and on behalf of a

44

National class against all Defendants.

177.   At all times relevant to this action, Plaintiff Carson Bride was a resident of the state of Oregon.

178.   The acts complained of herein, and the injury suffered by Plaintiff Carson Bride occurred in Oregon.

179.   As alleged above, Defendants' anonymous apps, YOLO and LMK which integrates with Snapchat, was unreasonably dangerous for use by teenagers, and the unreasonable danger was inherent in designing, maintaining, distributing the anonymous messaging function.

180.   At all material times, Defendants knew, or in the exercise of reasonable care, should have known that the anonymity features on teen messaging apps that lack adequate safeguards pose serious danger of mental harm to teen users. Yet, Defendants failed to warn users about the dangers of using the service – instead, it made false promises about preventing harm.

181.   Defendants' apps promoted cyberbullying and are designed to be inherently dangerous. LMK and YOLO are unable or unwilling to detect and identify abusive users who send bullying and harassing messages. These apps are also unable or unwilling to enforce their policies where they state they would ban, reveal, and report abusive users. Despite Snap Inc.'s policy of removing third-party apps from Snap Kit that are noncompliant, YOLO, LMK and Snapchat still lack safeguards to prevent cyberbullying.

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

By failing to enforce their stated policies, Defendants' apps hinder victims, parents, adults, and schools from identifying the abusive users and undermine efforts to prevent future harm. Defendants' products and services provide the means, motive, and opportunity for bullying to occur. Defendants' failure to enforce their policies spreads the belief among young users that they can impose harm behind screens without facing any consequences.

182.   As a direct result of the defective and unreasonably dangerous design of the Defendants' apps, Plaintiff Carson Bride suffered from bullying and harassment by unknown users on Defendants' apps and suffered while being unsuccessful at getting Defendants' apps to reveal the identities of those sending harassing messages.

183.   Defendants' apps caused Carson's pain, suffering, and wrongful death.

184.   The Estate of Carson Bride and Class members are therefore entitled to compensatory damages for physical and emotional pain and distress such as those suffered by Carson Bride in the months leading to his death, and the pecuniary loss and loss of society, companionship and services to Carson Bride's parents as the jury may determine fair and reasonable.

185.   The Estate of Carson Bride and Class members are entitled to punitive damages for the gross, continued, and callous misrepresentations such as those caused by the non-response of Defendant YOLO toward the Estate of Carson Bride, even after being notified of his death multiple times.

186.   The Estate of Carson Bride and class members are entitled to expenses such

46

as those incurred by Carson Bride for services including burial and memorial services.

187.   The Estate of Carson Bride and class members are entitled to attorney's fees and reimbursement of all costs as deemed fair and reasonable by the court.

188.   Putative Class members use and would use Defendants' apps in the future which entitles them to injunctive relief.

## SECOND CAUSE OF ACTION: NEGLIGENCE
### (Plaintiff Estate of Carson Bride Individually and on behalf of a Nation-wide Class Against All Defendants)

189.    Plaintiff Carson Bride, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

190.   Plaintiff Carson Bride brings this claim individually and on behalf of a National class against all Defendants.

191.   Defendants owed a due to use ordinary care in designing, maintaining, and distributing its services to teen users.

192.   Defendants were negligent in one or more of the following, each of which foreseeably created an unreasonable risk of injury to Carson Bride and was a substantial factor in causing Carson's death and Plaintiff's resulting damages:

- Failing to remove the dangerous function of anonymous apps or otherwise failing to use reasonable care to address the danger of anonymous apps created by Defendants;

47

- Marketing and soliciting teenagers to use the Defendants' apps without safeguards knowing that bullying and harassment would proliferate on the platforms;

- Failure to warn users about the serious negative effects of using the anonymity chat apps and instead falsely promoting positive effects;

- Failure to let users know that their purported safeguards (monitoring, reporting, banning, revealing identities) are not effective.

193.   Plaintiff reserves the right to supplement its specifications of negligence as to each of the Defendants after conducting reasonable and necessary discovery.

194.   As a direct and proximate result of the negligence of each of the Defendants, Plaintiff Carson Bride suffered from harassment by unknown users within his networks, suffered while making unsuccessful attempts to reveal the identities of those sending harassing messages, and suffered from the high volume of unfiltered messages sent to him that caused his wrongful death.

195.   The Estate of Carson Bride and Class members are therefore entitled to compensatory damages for physical and emotional pain and distress, such as those suffered by Carson Bride in the months leading to his death, and the pecuniary loss and loss of society, companionship and services to Carson Bride's family, as the jury may determine fair and reasonable.

196.   The Estate of Carson Bride and Class members are entitled to punitive

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

damages for the gross, continued, and callous misrepresentations, such as the non-response of Defendant YOLO toward the Estate of Carson Bride, even after being notified of Carson's death multiple times.

197.   The Estate of Carson Bride and Class members are entitled to expenses, such as those incurred by Carson Bride including burial and memorial services.

198.   The Estate of Carson Bride and Class members are entitled to attorney's fees and reimbursement of all costs as deemed fair and reasonable by the court.

199.   Putative Class members use and would use Defendants' apps in the future which entitles them to injunctive relief.

## THIRD CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION
### (Plaintiff Estate of Carson Bride, individually and on behalf of a National Class, Against All Defendants; Kristin Bride Against YOLO)

200.   Plaintiff Carson Bride, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

201.   Plaintiff Carson Bride brings this claim individually and on behalf of a National class against all Defendants.

202.   Kristin Bride brings this claim against YOLO.

203.   Defendants engaged in the tort of common law fraud or fraudulent misrepresentation.

204.   The elements of fraudulent misrepresentation are (1) the defendant made a false representation, (2) in reference to a material fact, (3) that the defendant made with

49

knowledge of its falsity, (4) with an intent to deceive, and (5) reliance was taken based on the representation.

205.   As described in the allegations above, the Defendants' statements about taking specific action to address bullying and harassing behavior -- including removing third-party apps, banning  abusive users and revealing their identities, reporting to authorities -- were in reference to a material fact to consumers, and Defendants knew those statements were false when they made them.

206.   The Defendants knew that victims of bullying would rely on the policies and assurance.

207.   The Defendants knew from news reports and customer reviews that teen users, supervising adults, app stores and app markets would consider the statement in determining whether the apps are suitable for teenagers' use.

208.   Defendant YOLO specifically set up a Contact Us form and a "law enforcement" email address for purportedly enforcing their policies. However, reports made through the contact form and email address were either invalid and/or ignored.

209.   Carson reasonably relied upon Defendants' statements to their detriment when he began to use YOLO.  Carson, at various points throughout the months preceding his death, looked up "YOLO Identity Reveal," trying to find ways to reveal the identities of the anonymous message senders.

210.   Kristin  Bride  reasonably  relied  upon  YOLO's  representations  and  sent

50

multiple requests to YOLO to urge YOLO to reveal the message senders' identities.

211.   In like manner, Plaintiff Carson reasonably relied upon Snapchat and LMK to carry out their own stated policies and guidelines when using their apps.

212.   The Defendants' fraudulent misrepresentations proximately caused harm to Plaintiffs Carson and Kristin Bride. By not revealing the identities of users who were sending anonymous harassing and bullying messages to Carson, the Defendants promoted cyberbullying. Defendant's fraudulent misrepresentation also caused Carson and Kristin to expend painstaking, frustrating effort to reveal the identities of abusive users sending harassing messages. While investigating which of his friends were sending him the abusive messages, Carson felt emotional distress, deep-seated vulnerability, and frustration. While relying for Defendants to fulfill their promise, Kristin suffered grief, frustration, anger, and helplessness. Defendants' fraudulent misrepresentation directly contributed to Plaintiff Carson's wrongful death and contributed to Carson's and Kristin's emotional harm.

213.   The Estate of Carson Bride, Kristin Bride, and Class members are therefore entitled to compensatory damages for physical and emotional pain and distress such as that suffered by Carson Bride in the months leading to his death, and the pecuniary loss and loss of society, companionship and services as the jury may determine fair and reasonable.

214.   The Estate of Carson Bride, Kristin Bride, and class members are entitled to punitive damages for the gross, continued, and callous misrepresentations such as the non-response of Defendant YOLO toward the Estate of Carson Bride, even after being notified

51

of Carson's death multiple times.

215.   The Estate of Carson Bride, Kristin Bride, and class members are entitled to expenses incurred for services such as those rendered to Carson Bride including burial and memorial services.

216.   The Estate of Carson Bride, Kristin Bride, and class members are entitled to attorney's fees and reimbursement of all costs as deemed fair and reasonable by the court.

217.   The Estate of Carson Bride, Kristin Bride and class members are also entitled to injunctive relief for ongoing misrepresentations by Defendants.

## FOURTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION
(Plaintiff Estate of Carson Bride, individually, and on behalf of a National Class Against All Defendants; Kristin Bride against Defendant YOLO)

218.   Plaintiff Carson Bride, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

219.   Plaintiff Carson Bride brings this claim individually and on behalf of a National class against all Defendants.

220.   Kristin Bride brings this claims against Defendant YOLO.

221.   Defendants committed the tort of negligent misrepresentation elements of which claim are: (1) the defendant made a false statement or omission of a fact, (2) the statement was in violation of a duty to exercise reasonable care, (3) the false statement or omission involved a material issue, (4) the plaintiff reasonably relied and to its detriment relied on the false information, and (5) the defendant's challenged conduct proximately

52

caused injury to the plaintiff.

222.   As described in the allegations above, Defendants made false statements about enforcing a zero-tolerance policy against bullying and harassing behavior, including banning users and revealing their identity, reporting harassment by users, and removing third-party apps that lack adequate safeguards against bullying and harassing behavior.

223.   These false statements violated the Defendants' duty of reasonable care to provide accurate information to its users, the app stores, and the general public.

224.   As described above, the Defendants' statements were made in reference to a material fact or issue which Plaintiffs Carson reasonably relied on to his detriment, and these statements were the proximate cause of his emotional distress damages and caused Carson's wrongful death.

225.   Kristin Bride reasonably relied upon YOLO's representations and sent multiple requests to YOLO to urge YOLO to reveal the message senders' identities.

226.   The Estate of Carson Bride, Kristin Bride, and Class members are therefore entitled to compensatory damages for physical and emotional pain and distress such as those suffered by Carson Bride in the months leading to his death, and the pecuniary loss and loss of society, companionship and services as the jury may determine fair and reasonable.

227.   The Estate of Carson Bride, Kristin Bride, and class members are entitled to punitive damages for the gross, continued, and callous misrepresentations such as the non-

53

response of Defendant YOLO toward the Estate of Carson Bride, even after being notified of Carson's death multiple times.

228.   The Estate of Carson Bride, Kristin Bride, and Class members are entitled to expenses incurred for services rendered such as burial and memorial services.

229.   The Estate of Carson Bride, Kristin Bride, and Class members are entitled to attorney's fees and reimbursement of all costs as deemed fair and reasonable by the court.

230.   Plaintiff Carson Bride, Kristin Bride, and Class members are also entitled to injunctive relief for ongoing misrepresentations by Defendants.

## FIFTH CAUSE OF ACTION: OREGON UTPA (OR. REV. STAT. §§ 646.605)
### (Plaintiff Estate of Carson Bride, Kristin Bride, on behalf of the Oregon sub-class Against All Defendants)

231.   Plaintiff Carson Bride, individually, and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

232.    The Oregon Unlawful Trade Practices Act ("UTPA"), ORS §646.605 *et seq*., protects persons who obtain real estate, goods or services primarily for personal, family or household purposes from fraudulent and unfair business practices.

233.   The UTPA generally prohibits the false representation or false advertising of goods and services. ORS §646.608(1)(e).

234.   Defendant's apps and services are marketed to customers primarily for personal, family or household purposes.

54

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

235.   Defendants YOLO, LMK and Snap Inc. violated the UTPA in the following respects:

- Creating and designing anonymous apps which are inherently dangers and failing to use reasonable care to address the danger and risk of such services;

- Marketing and soliciting the anonymous app' services to teenagers that lack adequate safeguards knowing that bullying and harassment would proliferate on the platforms;

- Failure to warn users about the serious negative effects of using the anonymity chat apps and instead falsely promoting positive effects;

- Failure to let users know that their purported safeguards (monitoring, detection, banning, revealing identities) are not effective; and

- Making false promises about specific actions they will take to combat cyberbullying such as banning abusive users and unmasking their identity, reporting to authorities, and removing third-party apps that violate zero-tolerance policies about cyberbullying.

236.   Defendant YOLO made affirmative misrepresentations as follows:

- Knowingly misrepresenting that it would reveal identities of, and ban users that engage in inappropriate and bullying conduct on the platform when the app is unable and/or unwilling to carry out the policy and

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

notice represented to consumers;

- Knowingly misrepresenting that it would respond to contacts made by users through the Contact Us forms and Law Enforcement emails.

237.   Defendant LMK made affirmative misrepresentations including: "LMK does not tolerate ANY objectionable content or abusive users. Any objectionable content posted on LMK will be reviewed by our Content Safety team." Upon information and belief, this statement is false.

238.   Defendant Snap Inc. made affirmative misrepresentations conveying that it would remove third-party apps that fail to confirm to its community guidelines against bullying and harassment. Upon information and belief, this statement is false.

239.   The unlawful trade practices alleged herein caused an ascertainable loss of injury to Plaintiffs and the sub-class.

240.   Pursuant to ORS 646.638(1), Plaintiffs and each sub-class member is entitled to a $200 minimum statutory penalty as a result of the unlawful trade practices alleged herein.

241.   Plaintiffs and the sub-class are entitled to their reasonable attorney fees pursuant to ORS 646.638(3).

242.   Plaintiffs and the sub-class are entitled to injunctive and equitable relief.

## SIXTH CAUSE OF ACTION: NEW YORK GENERAL BUSINESS LAW § 349
### (Plaintiff Tyler Clementi Foundation on behalf of New York sub-class against all Defendants)

243.   Plaintiff Tyler Clementi Foundation restates each and every paragraph of this Complaint as if fully rewritten herein.

244.   Plaintiff Tyler Clementi Foundation brings this claim on behalf of New York Sub-Class members.

245.   Plaintiff Tyler Clementi Foundation and New York Sub-Class members and Defendants are "persons" under N.Y. Gen. bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

246.   Plaintiff Tyler Clementi Foundation is associated with members who belong to the defined sub-class and have used, or are currently using Defendants' apps.

247.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

248.   The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section:

- Creating and designing anonymous apps which are inherently dangers and failing to use reasonable care to address the danger and risk of such services;

- Marketing and soliciting the anonymous app' services to teenagers that

57

lack adequate safeguards knowing that bullying and harassment would proliferate on the platforms;

- Failure to warn users about the serious negative effects of using the anonymity chat apps and instead falsely promoting positive effects;

- Failure to let users know that their purported safeguards (monitoring, detection, banning, revealing identities) are not effective; and

- Making false promises about specific actions they will take to combat cyberbullying such as banning abusive users and unmasking their identity, reporting to authorities, and removing third-party apps that violate zero-tolerance policies about cyberbullying.

249.   In the course of business, Defendants violated N.Y. Gen. Bus. Law § 349 by making false or misleading statements.

- In the course of business, Defendant YOLO made affirmative misrepresentations that were conveyed to Plaintiffs and Class members including: "if [users] send harassing messages to our users, your identity will be revealed" and "YOLO has no tolerance for objectionable content or abusive users. You'll be banned for any inappropriate usage." Upon information and belief, this statement is false.

- In the course of business, Defendant LMK made affirmative

58

misrepresentations including: "LMK does not tolerate ANY objectionable content or abusive users. Any objectionable content posted on LMK will be reviewed by our Content Safety team." Upon information and belief, this statement is false.

- In the course of business, Defendant Snap Inc. made affirmative misrepresentations conveying that it would remove third-party apps that fail to confirm to its community guidelines against bullying and harassment. Upon information and belief, this statement is false.

250.   In the course of business, Defendants YOLO and LMK made affirmative misrepresentations in its Privacy Policy conveying to Plaintiffs and Sub-Class members that it collects personally identifiable information to "protect and enforce our rights and the rights of other Users against unlawful activity, including identify theft and fraud, and other violations of our Terms of Use" which includes their zero-tolerance policy toward bullying and harassment." Upon information and belief, this statement is false.

251.   In the course of business, Defendant YOLO made affirmative misrepresentations that conveyed to Plaintiffs and Sub-Class members that certain reports and communications sent to their "law enforcement" email or through their CONTACT US form would be responded to in a timely manner. Upon information and belief, this statement is false.

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

252.   Plaintiff Tyler Clementi Foundation and New York Sub-Class members had no way of discerning whether Defendants' representations were false and misleading because Sub-Class members do not have access to Defendants' internal protocols, practice, and operations regarding their zero-tolerance policy and privacy policy.

253.   Defendants thus violated the NY DAPA by making false statements that induced reasonable consumers to believe that the apps would enforce their zero-tolerance policy against bullying and harassing behavior, reveal the bad actors' identities, and monitor the contents of users for harmful content as stated in the Defendants' marketing language, app store descriptions, terms of use, and privacy policy.

254.   Defendants intentionally and knowingly made affirmative misrepresentations regarding the services on their apps with intent to mislead Plaintiff Tyler Clementi Foundation and New York Sub-Class members.

255.   Defendants knew or should have known that their conduct violated the NY DAPA.

256.   Defendants' misrepresentations of their services were material to Plaintiffs and Class members.

257.   Defendants' unfair and deceptive acts were likely to, and did in fact, deceive regulators and reasonable consumers, including Plaintiffs and Sub-Class members,

258.   Plaintiff Tyler Clementi Foundation and New York Sub-Class members relied on the misrepresentations when they used the apps and gave their personal information and

60

data to the Defendants, which Defendants used to make profit.

259.   Defendants' violations present a continuing risk to Plaintiff, New York Sub-Class members, and the general public.

260.   Plaintiffs and New York Sub-Class are entitled to all injunctive relief, actual and statutory damages and punitive damages to the extent available under the law, reasonable attorneys' fees and costs, and all other just and appropriate relief available under the NY DAPA.

261.   Defendants' unlawful acts and practices complained of herein affect the public interest.

262.   Plaintiff Tyler Clementi Foundation and New York State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' actions.

263.   Defendants have an ongoing duty to all customers and the public to refrain from unfair and deceptive practices under the NY DAPA. As a result of Defendants' ongoing unlawful acts, Plaintiffs and all Class members are suffering ongoing harm.

264.   As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiff Tyler Clementi Foundation and Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and

costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

## SEVENTH CAUSE OF ACTION: NEW YORK GENERAL BUSINESS LAW § 350
### (Plaintiff Tyler Clementi Foundation on behalf of New York Sub-Class against all Defendants)

265.   Plaintiff Tyler Clementi Foundation incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

266.   Plaintiff Tyler Clementi Foundation brings this claim on behalf of New York State Class members.

267.   Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

268.   The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . ." N.Y. Gen. Bus. Law § 350-a.

269.   Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue

or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading.

270.   Defendants made numerous material and affirmative misrepresentations and omissions of fact with intent to mislead and deceive concerning the zero-tolerance for bullying and harassing users using their apps as well as their use of personally identifiable information.

271.   Plaintiff and New York Sub-Class are entitled to all injunctive relief, actual and statutory damages and punitive damages to the extent available under the law, reasonable attorneys' fees and costs, and all other just and appropriate relief available under the NY FAA.

**EIGHTH CAUSE OF ACTION : CALIFORNIA BUSINESS AND PROFESSIONAL CODE §§17200 & 17500**
(All Plaintiffs on behalf of National Class Against All Defendants)

272.   Plaintiffs restate each and every paragraph of this Complaint as if fully rewritten herein.

273.   Plaintiffs on behalf of a National Class allege claims under California Business and Professional Code §§17200 & 17500 *et seq*.

274.   Defendants have engaged in unfair competition and prohibited activities.

275.   Unfair competition includes any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by California Bus. & Prof. Code §§17200 and 17500 *et seq*.

63

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

276.   Plaintiffs and the putative National class seek equitable relief and to enjoin Defendants from engaging in its current practice and scheme of making misrepresentations about their services and guidelines, and enforcement to the detrimental harm of its users.

277.   Pursuant to Cal. Bus. & Prof. Code §17200 and 17500 *et seq*., Plaintiffs and the putative National class seek an order enjoining the above-described wrongful acts and practices of the Defendants and for restitution and disgorgement.

### NINTH CAUSE OF ACTION : UNJUST ENRICHMENT
(All Plaintiffs on behalf of National Class Against All Defendants)

278.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

279.   Plaintiffs, and the putative National class, conferred a tangible economic benefit upon Defendants by signing up as a user to the apps, sacrificing privacy rights and privileges, and consuming advertisements.

280.   Through the profits gained by the sale of personal and non-personal information of users and other purchases facilitated on the apps, Defendants reaped hundreds of millions of dollars of profit from its dangerous and defectively designed products and services, misrepresentations and deceptive trade practices. Defendants specifically represented in their privacy policies that they would collect private data to monitor and detect unlawful and inappropriate content that runs afoul their policies against

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

bullying and harassment. Instead, Defendants were enriched by their collection of minor users' private data and selling it for advertisements and other profitable uses. Plaintiffs lost their privacy with no benefit in exchange and was exposed to harm as a result.

281.   Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that it received from Plaintiffs and members of the putative class.

282.   It would thus be unjust and inequitable for Defendants to retain the benefit reaped from Plaintiffs and National Class members without restitution or disgorgement of valuable goods (e.g., personal data, in app purchases and more) provided to Defendants, or such other appropriate equitable remedy as appropriate, to the Plaintiffs and other members of the putative National class.

## TENTH CAUSE OF ACTION : INJUNCTIVE RELIEF
(Plaintiffs and National Class Against All Defendants)

283.   Plaintiffs, individually, and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

284.    Defendants have refused to act on grounds generally applicable to the injunctive relief sought by Plaintiffs and other members of the putative class and subclass, thereby making final injunctive relief appropriate.

285.   Defendant's conduct, as more fully set forth herein, both in the past and

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

through the present, has demonstrated a willful disregard for the health and safety of minors and their parents and made misrepresentations and deceptive trade practices.

286.   If Defendants continue with these practices, consumers, including the Plaintiffs and the putative classes will be irreparably harmed in that they do not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged in this Complaint, unless injunctive relief is granted to stop Defendant's improper conduct.

287.   Plaintiffs and the putative National class and Sub-classes are therefore, entitled to an injunction requiring Defendants to carry out and implement the actions it has set forth in its own guidance to prevent bullying. Until the time that safeguards can be implemented, Defendants' app shall be discontinued of its service, temporarily made unavailable on all app stores, and cease to allow users to access its app services.

## **PRAYER FOR RELIEF**

WHEREFORE, the putative representative Plaintiffs, on behalf of themselves and the putative members of the class defined herein prays for judgment against the Defendants as follows:

A. For an order certifying this action and/or common issues raised herein as a "Class Action under the appropriate provision of Federal Rule of Civil Procedure 23(a), 23(b)(2) and/or (b)(3); designating Class Representatives; and appointing the undersigned to serve as class counsel.

B. For notice of class certification and of any relief to be disseminated to all Class

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

Members and for such other further notices as this Court deems appropriated under Fed. R. Civ. P. 23(d)(2);

C. For an order requiring complete and immediate disclosure of all studies, reports, analyses, data, compilations, and other similar information within the possession, custody, or control of Defendants concerning, relating to, or involving the marketing, advertising, development, implementation, creation, and partnership between Defendants and their media partners;

D. For an order barring Defendants from destroying or removing any computer or similar records which record evidence related to the claims above.

E. For an order barring Defendants from attempting, on its own or through its agents, to induce any putative Class Members to sign any documents which in any way releases any of the claims of any Putative Class Members;

F. For an order mandating YOLO and LMK to be immediately discontinued and banned from the market until they can prove that effective safeguards are implemented and enforced. Additionally, for an order mandating Snap Inc. to immediately remove all third-party apps on Snap Kit that fail to set up appropriate safeguards for young users from cyberbullying. For and order restraining Defendants from marketing, selling, operating, and otherwise replicating its services, specifically, anonymous messaging features, in the form of a different corporate entity and service;

67

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

G. For granting declaratory and injunctive relief to Plaintiffs as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct and pay them, restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be wrongful;

H. For an award of compensatory damages in the amount exceeding $5,000,000, to be determined by proof of all injuries and damages described herein and to be proven at trial;

I. Awarding Plaintiffs and the National Class and Sub-Class members appropriate relief, including actual and statutory damages;

J. Awarding Plaintiffs, the National Class and Sub-Class members punitive damages to the extent allowable by law, in an amount to be proven at trial;

K. Awarding restitution and disgorgement of Defendants' revenues to the Plaintiffs and the proposed Class and Sub-Class members;

L. Ordering Defendants to change their practice and set up safeguards to prevent harassment and bullying online and engage in a corrective advertising campaign;

M. Compensation to Plaintiff Estate of Carson Bride for the physical and emotional pain and distress which Plaintiff Carson Bride suffered during months preceding his death from the use of Defendants' apps, for his wrongful death, for the pecuniary loss and loss of society, companionship and services to the parents of Plaintiff

Carson Bride including punitive damages against Defendant YOLO for the gross, continued, and callous misrepresentations and non-response of Defendant YOLO toward Kristin Bride and the Estate of Carson Bride, even after being notified of the Carson's death multiple times, and expenses incurred for services rendered to Carson Bride, decedent, including charges for burial and memorial services.

N. Awarding Plaintiffs and the Class reasonable attorney's fees and costs of prosecuting this action, including expert witness fees;

O. Awarding pre-judgment and post-judgment interest; and

P. Providing such other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all issues a jury may properly decide and for all of the requested relief that a jury may award.

Dated: <u>May 10, 2021</u>                    Respectfully submitted,

By:   **EISENBERG & BAUM, LLP**

Juyoun Han, Esq. (*seeking pro hac vice*)
Eric Baum, Esq. (*seeking pro hac vice*)
24 Union Square East, PH
New York, NY 10003
*Attorneys for Plaintiffs*[43]

---

[43] Plaintiff's Counsel thanks student intern Patrick K. Lin (Brooklyn Law School, 2L) for his contribution to this case and Complaint.

69

*Bride et al. v. Snap Inc. et al.* – COMPLAINT

1

2                                            /s/ John K. Buche

3                                            John K. Buche (*Local Counsel*)
                                             **BUCHE & ASSOCIATES, P.C.**
4                                            875 Prospect St., Suite 305
                                             La Jolla, CA 92037
5                                            *Attorneys for Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Bride et al. v. Snap Inc. et al.* – COMPLAINT